IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**UNITED STATES OF AMERICA**,

   Plaintiff,

   v.

**BRENDA VELAZQUEZ-CORCHADO** [7], *et al.*,

   Defendants.

Criminal No. 11-359 (ADC/BJM)

## REPORT AND RECOMMENDATION

Brenda Velazquez-Corchado stands indicted on one count of conspiracy to commit theft or bribery concerning programs receiving Federal funds, in violation of 18 U.S.C §§ 371, 666(a)(1)(B), and 666(a)(2). (Docket No. 3). Before the court is defendant's motion to suppress certain statements that she gave prior to being indicted. (Docket No. 318, or "Mot."). The government opposed. (Docket No. 349). The motion was referred to me for a report and recommendation. (Docket No. 341). An evidentiary hearing was held on January 28, 2013. (Docket No. 357). For the reasons that follow, I recommend that the motion be **denied.**

### FACTUAL AND PROCEDURAL BACKGROUND

The following facts are derived from the testimony heard during the evidentiary hearing, and the exhibit admitted into evidence. The court heard testimony from FBI Special Agent Mark J. Roberts and from defendant Velazquez.

*March 2, 2010 Interview*

On March 2, 2010, agents from the FBI and the United States Department of Education-Office of the Inspector General ("USDOE-OIG") executed a search warrant at the offices of the Puerto Rico Department of Education ("PRDOE"). During the warrant's execution, employees were assembled in a break room and some of them were individually called out for interviews.

The interviewees had been pre-selected as either targets or potential witnesses. At the beginning of the interviews, agents generally told interviewees they would be free to leave.

Agent Roberts and USDOE-OIG Agent Robert Wolfe interviewed Velazquez in an office on site, behind closed doors. The agents told Velazquez that they were conducting an investigation regarding federal funds and asked her about checks that she received from a vendor. Velazquez testified that the agents conducted themselves very well, that she answered questions voluntarily, and that she felt free to leave at any time. They told her the interview would be confidential. According to Roberts, she was not promised immunity. Velazquez, on the other hand, recalled being told "at all times" that she was not a target of the investigation, and that if she cooperated with their questioning she would get off scot-free. Roberts did not recall whether the question of her being a target came up. The interview lasted thirty minutes.

*March 10, 2010 Interview*

Sometime between March 2 and 10, 2010, Wolfe called Velazquez and asked her to come to the FBI offices at the Federal Building. Wolfe told Velazquez that he had evidence of a three-party call, giving him reason to believe that she knew about illegal activity in the PRDOE. However, he also said that she was not obligated to come to the interview. According to Velazquez, however, she was also told that if she did not come, she could be charged. On March 10, Velazquez went to the FBI office and was interviewed again by Agents Wolfe and Roberts. The interview took place behind closed doors but Velazquez was told that she was free to leave and that she was not under arrest. Roberts testified that Velazquez was told about the purpose of the interview and she did not ask for an attorney. The agents promised her confidentiality. According to Velazquez, the agents asked her to cooperate and threatened to add her to the indictment if she did not share information they believed she knew. She also testified that the agents said they were not going to file charges against her if she cooperated. She also claims

they told her to think about her daughter, because she could end up being far away from her if she did not cooperate. On the other hand, Roberts testified that he and Wolfe never threatened to take her daughter away if she didn't speak. According to Velazquez, they said they had information about her husband. According to Roberts, Velazquez also "confirmed that her husband had cashed checks," and then "was told that her husband was involved in the scheme, and he could potentially face charges." The interview lasted from one to one and a half hours.

*September 28, 2010 Interview*

Somewhere between March 10 and September 28, 2010, Wolfe called Velazquez and asked her to come to the USDOE-OIG office in San Juan, Puerto Rico, for another interview. On September 28, 2010, Velazquez voluntarily went to the USDOE-OIG office where she was interviewed by Wolfe, Roberts, and Assistant United States Attorney Jeanette Mercado. Before the interview, Velazquez was notified of her Miranda rights through a FD-3595.15 "Advice of Rights" form, which she read in Spanish and signed indicating she waived her rights and wished to answer questions without an attorney. (See Hrg. Ex. 1). Velazquez testified that she understood the form, that she signed it voluntarily, and that she was not threatened. The interview lasted no more than an hour. They mentioned that an audio recording of Velazquez had been made. According to Velazquez, the interview ended when she claimed not to know anything about her supervisor's potential involvement; the AUSA became upset and got up to leave, and Wolfe told Velazquez that she had upset the prosecutor for not talking, and that next time he met with her, he would see her with a lawyer.

The instant indictment was returned on September 19, 2011, and Velazquez was arrested the same day. (Docket Nos. 3, 78).

**DISCUSSION**

Velazquez moves to suppress her statements on two grounds. First, she contends that prior to the March 2 and 10 interviews, the government failed to advise her of her rights as required by Miranda v. Arizona, 384 U.S. 436, 444 (1966). (Mot., p. 6). Second, she contends that law enforcement officers employed accusatory and harassing tactics that render her statements involuntary. (Mot., p. 5).

**I.** *Miranda* **Warnings**

In *Miranda*, the Supreme Court held that a person questioned by law enforcement officers after being taken into custody must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. The Miranda warnings are designed to protect the Fifth Amendment privilege against self-incrimination from the high risks of coercion inherent in custodial interrogations. See U.S. Const. amend. V; Miranda, 384 U.S. at 467. A statement obtained by government agents as a result of a custodial interrogation must be suppressed unless the government can prove by the preponderance of the evidence that the defendant was properly advised of his rights and that he voluntarily, knowingly, and intelligently waived those rights. Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004); United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000).

But *Miranda* warnings are only necessary where the suspect is "in custody." United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011). To this end, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quotation marks and citation omitted). In the absence of formal arrest, a reviewing court must (1) "ascertain the circumstances surrounding the interrogation," and (2) determine whether they objectively

constitute a "'restraint on freedom of movement of the degree associated with a formal arrest.'" Hughes, 640 F.3d at 435 (quoting Beheler, 463 U.S. at 1125). Importantly, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). "Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." United States v. Ventura, 85 F.3d 708, 711 (1st Cir. 1996) (internal quotation marks omitted).

Taking these factors in consideration, I see no indication that Velazquez's March 2 interview took place in circumstances where a reasonable person would have found her freedom restrained to the degree associated with an arrest. First, the interview happened at Velazquez's own workplace. See United States v. Crooker, 688 F.3d 1, 11 (1st Cir. 2012) (familiar surroundings, in general, tend to be significantly less intimidating than unfamiliar locations). Second, although there were numerous agents executing a search warrant on the premises, only two agents interviewed Velazquez. See id. at 12 (no custody where approximately *thirty* officers were executing a warrant at defendant's house, but no more than two were in direct conversation with the defendant at one time). Third, the agents did not exert any physical restraint beyond closing the door of the room in which the interview was held, and Velazquez testified that she felt free to leave at any time. See Oregon v. Mathiason, 429 U.S. 492, 494-95 (1977) (interview non-custodial even though held behind closed doors in a stationhouse office). Finally, the interview lasted about thirty minutes—a relatively short time. See United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (twenty-five minute interview non-custodial); United States v.

Nishnianidze, 342 F.3d 6, 14 (1st Cir. 2003) (forty-five minute interview non-custodial). On March 2, Velazquez was not in custody for *Miranda* purposes.

Nor was she in custody on March 10. Importantly, Velazquez went to the FBI offices without being arrested. Even if she feared prosecution if she did not come, she was nonetheless told that she was free to leave and not under arrest, and left the FBI offices unhindered at the end of the interview. See Mathiason, 429 U.S. at 495 (no custody; among other factors, defendant "came voluntarily to the police station" and "was immediately informed that he was not under arrest"); see also United States v. McCarty, 475 F.3d 39, 46 (1st Cir. 2007) (no custody where officer "explained to McCarty that he was not under arrest, that he was free to leave at any time, and that he did not have to answer any questions."). Additionally, only two agents conducted the interview, and Velazquez was not placed under any significant physical restraint; although the interview took place behind closed doors, the agents testified that the doors were closed for privacy reasons.

On balance, a reasonable person in Velazquez's position would not have believed that her freedom was restricted to the level associated with an arrest during the March 10 meeting. Because *Miranda* warnings were not required before either interview, Velazquez is not entitled to suppression on this ground.

**II.    Voluntariness**

Velazquez further claims that the conditions surrounding each meeting rendered her statements involuntary and therefore inadmissible. (Mot., p. 8-9). "It is elementary that a coerced confession cannot be admitted to prove a defendant's guilt." Hughes, 640 F.3d at 438. To determine if a statement provided by a defendant was voluntary, the constitutional[1] inquiry is

---

[1] Velazquez also invokes the admissibility-of-confessions analysis set forth in 18 U.S.C. § 3501. But as discussed above, Velazquez was never under formal arrest or its equivalent during her two March 2010 interviews. There is likewise no evidence of any restraint on Velazquez's liberty before or during the September 28, 2010

whether, in the totality of circumstances, law enforcement officials obtained a statement by overbearing the will of the defendant. Dickerson v. United States, 530 U.S. 428, 434 (2000). "The determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" Dickerson, 530 U.S. at 434 (citing Stein v. New York, 346 U.S. 156, 185 (1953)). Relevant considerations include—but are not limited to—the length and nature of the questioning, promises or threats, deprivation of essentials (e.g., food, water, sleep, bathroom facilities), and "an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state." Hughes, 640 F.3d at 438. On the other hand, "[t]he Supreme Court has admonished that 'a defendant's mental condition, by itself and apart from its relation to official coercion,' can never serve as a sufficient basis for a finding of involuntariness." Hughes, 640 F.3d at 438 (citing Connelly, 479 U.S. at 164).

I first address Velazquez's general argument that her "delicate mental health condition" carries substantial weight in the coercion calculus. (Mot., p. 5). The only evidence of any impairment in her mental condition is a "Psychodiagnostic Assessment Report" procured by the defense. (Docket No. 211-1).[2] The report, prepared in mid-2012, documents an episode of severe major depressive disorder lasting approximately one year between 2000 and 2001, and diagnoses her with recurrent severe major depressive disorder "related to her legal situation." (Id.). But as the government points out, the report has little bearing on the constitutional voluntariness inquiry for two reasons. First, it is wholly silent on the question of her mental state during 2010, when the interviews at issue occurred. Thus, there is no evidence on which to

---

interview. Because § 3501 may not be invoked to suppress a confession given "at any time at which the person who made or gave such confession was not under arrest or other detention," it is not necessary to consider its factors separately. See § 3501(d).

[2] The document is sealed as an *ex parte* filing in CM/ECF; however, both sides' memoranda rely on its contents, and it was ordered to be produced to the government. (See Docket No. 340) (ordering production). I take the parties' reliance on the document (and the government's lack of objection) to reflect an understanding that the court will rely on it as evidence in deciding this motion.

ground a non-speculative assessment of any impairment during the relevant time. Second, the report concluded that Velazquez's diagnoses "do not currently interfere with her ability to understand legal proceedings, consult with counsel, and make decisions about her legal situation." (Id.). And since Velazquez did not put on any other evidence of her mental state, or how she might suffer any out-of-the-ordinary vulnerability to police tactics, this outlook minimizes any residual doubt. In sum, there is not enough evidence of how she might have been impaired, if at all, so as to alter the voluntariness calculus in any significant way.

Considering the circumstances of each challenged interview in turn, I find that the statements Velazquez provided were all voluntary. As for the March 2, 2010 interview, she squarely testified that she answered the questions voluntarily. Furthermore, she testified that the agents carried themselves very well and that she did not feel threatened. Her claim of coercion there has no merit.

The March 10 interview presents a series of closer questions. Before that interview, agents told Velazquez that they had evidence linking her to their investigation, and asked her to come to the FBI offices for an interview lest she be prosecuted. It is not clear whether such evidence exists, and it is possible that the agents lied in order to lure Velazquez into the interview. "Certainly some times of police trickery can entail coercion: consider a confession obtained because the police falsely threatened to take a suspect's child away from her if she did not cooperate." United States v. Byram, 145 F.3d 405, 408 (1st Cir. 1998). On the other hand, police acceptably and "commonly engage in such ruses as suggesting to a suspect that a confederate has just confessed or that police have or will secure physical evidence against the suspect." Id.; United States v. Flemmi, 225 F.3d 78, 91 n. 5 (1st Cir. 2000) ("Of course, trickery can sink to the level of coercion, but this is a relatively rare phenomenon"). Even granting that

Velazquez may have been deceived, a lie suggesting that she was already incriminated does not establish unconstitutional coercion.

Going further, Velazquez argued pre-hearing that she was coerced by a threat to separate her from her seven-year-old daughter. (Mot., p. 6). But at the hearing, she only testified that the agents told her to "think about" her daughter, because if indicted she "could end up far away" from her daughter. Velazquez attempts to liken her case to Lynumn v. Illinois, where all sides agreed that a mother's confession was coerced because it "was made only after the police had told her that state financial aid for her infant children would be cut off, and her children taken from her, if she did not 'cooperate.'" See 372 U.S. 528, 534 (1963). For the purpose of this analysis, I can give weight to Velazquez's testimony—crediting it over Agent Roberts's less direct denial of a "threat"—and assume that the agents told her to "think about" her daughter and the possibility of ending up "far away" from her. But while such topics would exert a significant degree of pressure, it does not cross the line into overbearing, even in light of all other circumstances. Lynumn is distinguishable, as Velazquez was never threatened with any specific government interference in her parent-child relationship, and no other factors suggest that this was the understanding a person in her position would have rationally held. In other words, there is a difference in degree between the threat in Lynumn—that the State would cart the suspect's children away—and the perhaps menacing, but frankly accurate assessment presented to Velazquez: if convicted and jailed, she will probably not be near her daughter. Cf. Lynumn, 372 U.S. at 534 ("She had no previous experience with the criminal law, and had no reason not to believe that the police had ample power to carry out their threats.").

Velazquez also argued that agents coerced her by threatening to file charges against her husband. (Mot., p. 6). The hearing testimony only shows that agents told her to "think about" him, and that once she confirmed their suspicion that he had cashed checks from vendors, they

remarked that he might face prosecution as well. For the reasons already discussed, it is doubtful that the exhortation to "think about" one's husband would have an objectively overbearing effect on the listener beyond highlighting the practical implications of incarceration. The remarks about his potential criminal exposure likewise do not suggest any undue pressure; importantly, they did not threaten to fabricate charges against him because of Velazquez's involvement or non-cooperation, but rather pointed out how he had potentially engaged in illegal conduct himself *after* she had already discussed the conduct. While being faced with this assessment may have motivated Velazquez to cooperate further, the remark hardly reflects any threat of overreaching or abuse of power.

Next, Velazquez argues that she was influenced by the agents' false assurances that she was not a target of the investigation and that her statements would remain confidential. (Mot., p. 8). Roberts, for his part, credibly testified that Velazquez was never told that she was not a target or that she would not be charged. But in any case, "[a]lthough the fact that the agents allowed [defendant] to believe that he was not under investigation may have made him less guarded and self-protective, that deception alone did not make his statements involuntary." United States v. Boskic, 545 F.3d 69, 80 (1st Cir. 2008). To whatever extent Velazquez believed she enjoyed immunity, any of the agents' statements that may have cultivated that belief do not amount to coercion. See Flemmi, 225 F.3d at 91 ("The mere fact that an unfulfilled promise was made in exchange for a person's statement does not constitute coercion, rendering the statement involuntary . . . ."); Byram, 145 F.3d at 408 ("[I]t would be very hard to treat as *coercion* a false assurance to a suspect that he was not in danger of prosecution") (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

In sum, the hearing testimony did not show that Velazquez's will was overborne before or during the March 10 meeting. She was not threatened with violence or retaliation if she refused

to cooperate. To be sure, the agents likely raised several points of discussion that elevated the pressure Velazquez was facing. But the Constitution does not require federal investigators to treat every suspect with kid gloves, and even taken together, these did not come close to crossing the line into unconstitutional overbearing. Moreover, the other circumstances suggest Velazquez was under less pressure than the archetypal just-booked arrestee. For instance, although the agents asked Velazquez to come to the FBI offices for an interrogation, they also told her that she did not have to come. Velazquez voluntarily showed up for the interview. The agents told Velazquez that she was free to leave and that she was not under arrest. Furthermore, she did not ask for an attorney. In the totality of these circumstances, Velazquez's statements cannot be considered involuntary.

Finally, there is no indication that Velazquez was coerced during the September 28, 2010 interview. Importantly, Velazquez signed a waiver form indicating that she understood her rights and that she was willing to answer questions without an attorney present. (See Hrg. Ex. 1). There is no evidence that this waiver was involuntary. To the contrary, Velazquez testified that she read the form in Spanish and understood it, signed it voluntarily, and was never threatened. While *Miranda* warnings do not foreclose a voluntariness inquiry, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984). As before, Velazquez arrived voluntarily, was not arrested, and was only interviewed for about an hour. The only hint of a pressuring tactic here was the additional presence of an AUSA, the prosecutor's sudden exeunt when Velazquez professed ignorance of her supervisor's involvement, and the agent's aside about next seeing Velazquez "with a lawyer." But Velazquez testified that the interview ended at this point, and she does not explain how this series of events pressured her into making any further statements.

Measured by the above-described standards, this vignette may have been somewhat dramatic, but nevertheless did not cross any constitutional boundary.

On balance, there are no indications that any of the challenged statements were the product of coercion. Although there is evidence that Velazquez had once suffered severe major depression between 2000 and 2001, and that the condition had recurred by 2012, there is no evidentiary basis for concluding that this made her especially susceptible to pressure during the 2010 interviews. Moreover, there is little evidence of inappropriate pressure of any kind, and none that crosses the constitutional threshold of overbearing Velazquez's will. Velazquez is therefore not entitled to suppression on involuntariness grounds.

## CONCLUSION

For the foregoing reasons, I recommend that the motion be **DENIED.**

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 26th day of February, 2013.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge